

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER SCHNEIDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 3105 |
| | ) | |
| GEORGE LOVE, Deputy, Lake | ) | |
| County Sheriff's Department, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>OPINION AND ORDER</u>

Plaintiff Christopher Schneider alleges that defendant George Love, a

Lake County, Illinois Deputy Sheriff, used excessive force when tasing and

striking him during an arrest. Presently pending is defendant's motion for

summary judgment. Defendant contends undisputed facts support that it was

reasonable to briefly use force to subdue and handcuff plaintiff following a pursuit

and hostage situation involving plaintiff's children. Plaintiff contends there is

sufficient evidence to support a factual dispute that, despite the earlier pursuit and

conduct, he was voluntarily surrendering and therefore the force used was

unnecessary and unreasonable.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, 129 S. Ct. 846, 849 (2009); *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010); *Knight v. Wiseman*, 590 F.3d 458, 462 (7th Cir. 2009). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009); *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 651 (7th Cir. 2007); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). The nonmovant, however, must make a showing sufficient to establish any essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008); *Hicks*, 500 F.3d at 651. The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex*, 477 U.S. at 324; *Freundt v. Allied Tube & Conduit Corp.*, 2007 WL 4219417 *2 (N.D. Ill. Nov. 29, 2007); *O'Brien v. Encotech Constr.*, 2004 WL 609798 *1 (N.D. Ill. March 23, 2004). Also, it is not sufficient to show evidence of purportedly disputed facts if those

facts are not plausible in light of the entire record. *See **Lorillard Tobacco Co. v. A & E Oil, Inc.**, 503 F.3d 588, 594-95 (7th Cir. 2007); **Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of Chicago**, 357 F.3d 677, 679 (7th Cir. 2004); **NLFC, Inc. v. Devcom Mid-America, Inc.**, 45 F.3d 231, 236 (7th Cir. 1995); **Covalt v. Carey Canada, Inc.**, 950 F.2d 481, 485 (7th Cir. 1991); **Collins v. Associated Pathologists, Ltd.**, 844 F.2d 473, 476-77 (7th Cir. 1988); **Freundt**, 2007 WL 4219417 at \*2. As the Seventh Circuit has summarized:*

> The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." **Logan v. Commercial Union Ins. Co.**, 96 F.3d 971, 978 (7th Cir. 1996) (citing **Celotex Corp. v. Catrett**, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and internal quotation omitted)). The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." **Celotex**, 477 U.S. at 325, 106 S. Ct. 2548. Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" **Logan**, 96 F.3d at 978. "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." **Id.** (citation omitted). In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly

disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.,* 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted). Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505 (1986). Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" *Logan,* 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

*Outlaw,* 259 F.3d at 837.

The arrest at issue occurred following plaintiff's violent assault of his girlfriend early that morning and the previous night. Plaintiff is currently incarcerated, having been found guilty of aggravated domestic battery and criminal sexual assault. At the time briefing of the summary judgment motion began, an appeal was pending, but it did not involve any issues concerning guilt or the sentence of incarceration. The appeal was decided while summary judgment was being briefed. *See People v. Schneider,* 403 Ill. App. 3d 301, 933 N.E.2d 384

(2d Dist. 2010).[1] Pending in the trial court was plaintiff's post-conviction petition which challenges his conviction and potentially could result in plaintiff being retried.[2] During plaintiff's deposition in this case, he invoked the Fifth Amendment in refusing to answer questions as to whether injuries he had immediately following his arrest had been caused by his girlfriend during the prior evening's domestic violence. Besides being evidence regarding injuries suffered,[3] defendant contends the refusal to answer is a basis for dismissing plaintiff's case.

Defendant contends it was improper to invoke the Fifth Amendment because plaintiff was already convicted and was not challenging his conviction on appeal. To the extent defendant believed it was improper to invoke the Fifth Amendment, he could have brought a motion to compel plaintiff's testimony while

---

[1]The appeal raised issues regarding fees imposed for a public defender reimbursement and mental health assessment; the amount of a victim assistance fine; and the term of mandatory supervised release. The Illinois Appellate Court remanded the case with directions to provide a credit for the mental health assessment and reduce the victim assistance fine, and also to hold a further hearing regarding the defender fee. The term of mandatory supervised release was affirmed.

[2]No information has been provided indicating that the post-conviction petition has been finally decided, either in the trial court or on appeal.

[3]Plaintiff also claims he was unnecessarily tased. It is undisputed that defendant administered three taser shots to plaintiff. Plaintiff contends all three were excessive, but another possibility is that the first taser shot was reasonable, but one or both of the other two were not.

discovery was still open, which he did not. *See Gunville v. Walker*, 583 F.3d 979, 986 & n.3 (7th Cir. 2009); *Harris v. City of Chicago*, 266 F.3d 750, 752-53 (7th Cir. 2001). Even if defendant has not waived challenging the propriety of invoking the Fifth Amendment privilege, the evidence and arguments before the court do not support that plaintiff improperly invoked the Fifth Amendment. Plaintiff responds by pointing to the fact that he has the pending post-conviction petition that might result in a retrial of the sexual assault and battery charges. Therefore, his testimony could still implicate him in a criminal proceeding.

Defendant also contends it was improper to invoke the Fifth Amendment because plaintiff had already testified at the first trial.[4] That, however, does not constitute a waiver precluding plaintiff from declining to testify at a further trial or invoking the Fifth Amendment prior to any retrial. *United States v. Rivas-Macias*, 537 F.3d 1271, 1280 & n.14 (10th Cir. 2008); *Instituto Nacional De Comercializacion Agricola (INDECA) v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 530 F. Supp. 276, 277 (N.D. Ill. 1981); *Cordeck Sales, Inc. v. Constr. Sys., Inc.*, 382 Ill. App. 3d 334, 887 N.E.2d 474, 492 (1st Dist.

---

[4]Defendant does not contend that any of plaintiff's testimony during his deposition acted as a waiver precluding him from declining to answer questions about any injuries he incurred during any confrontation with his girlfriend.

2008); Dan K. Webb, Robert W. Tarun, & Steven F. Molo, *Corp. Internal Investigations* § 14.08[1] (2010) ("The majority view appears to be that 'a waiver of the privilege in one proceeding does not affect a witness' rights in another proceeding.'"). In Illinois criminal proceedings, "a witness does not waive his right to invoke his fifth amendment privilege against self-incrimination at trial simply because he provided prior testimony before a grand jury in the same case (*[People v.] Craig*, 334 Ill. App. 3d [426,] 445-46, 778 N.E.2d 192, [208 (1st Dist. 2002)]), or because he provided testimony at a prior related trial (*People v. Stufflebeam*, 19 Ill. App. 3d 462, 463-64, 311 N.E.2d 601, [602-03] (1974))." *Cordeck Sales*, 887 N.E.2d at 492. On the present motion, it will not be held that plaintiff waived the right to invoke the Fifth Amendment.

Even assuming the Fifth Amendment was properly invoked, defendant contends the appropriate action to take is to dismiss plaintiff's case. Seventh Circuit case law, however, is clear that dismissal is not appropriate solely based on invocation of the Fifth Amendment privilege. An adverse inference may be drawn and is discretionary with lesser sanctions also being appropriate. *See Evans v. City of Chicago*, 513 F.3d 735, 740-41 (7th Cir. 2008); *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 389-90 (7th Cir. 1995); *Daniels v. Pipefitters'*

*Ass'n Local Union No. 597*, 983 F.2d 800, 802 (7th Cir. 1993). The adverse inference is not conclusive although it may preclude proof of injury. *Seguban*, 54 F.3d at 390-91. Defendant still must provide evidence supporting any fact on which he bears the burden of proof, and plaintiff can still point to other evidence supporting the existence of a genuine factual dispute. *See Brenner v. CFTC*, 338 F.3d 713, 720 (7th Cir. 2003); *Seguban*, 54 F.3d at 390-91; *Hawkins v. St. Clair Cnty.*, 2009 WL 559373 *5-6 (S.D. Ill. March 5, 2009); *Sebastian v. City of Chicago*, 2008 WL 2875255 *38 (N.D. Ill. July 24, 2008).

Resolving all genuine factual disputes and drawing all reasonable inferences in plaintiff's favor, the facts assumed to be true for purposes of ruling on defendant's motion for summary judgment are as follows. At relevant times, defendant was a Lake County, Illinois Deputy Sheriff. Defendant weighed 340 pounds and could bench press 315 pounds.

For several hours on the night of June 30, 2007 and into the early morning hours of July 1, plaintiff assaulted his girlfriend, "N.M." Plaintiff assaulted N.M. with a baseball bat and electric saw, bound her with duct tape, and sexually assaulted her.[5] Based on this incident, plaintiff was later found guilty of

---

[5]These and other facts are recited as background. The information defendant was aware of at the time he employed force is set forth below.

criminal sexual assault in violation of 720 ILCS 5/12-13(a)(1) and aggravated domestic battery in violation of 720 ILCS 5/12-3.3(a). *Schneider*, 933 N.E.2d at 386. Plaintiff is presently incarcerated on the term of incarceration imposed for this conviction. A petition for post-conviction relief is pending in state court.

As of June 2007, four of their children lived with plaintiff and N.M. in Antioch, Illinois, which is in Lake County. At 9:00 a.m. on July 1, plaintiff took N.M. to a hospital in Lake County and drove off with the four children. Shortly after N.M.'s arrival at the hospital, the assault was reported to the Lake County Sheriff. At approximately 9:30 a.m., an Illinois State Police Emergency Radio Network bulletin was issued. It listed plaintiff's last name and home address; the color, year, model, and license plate of the car the suspect was in; his height, weight, hair color, and eye color; that he was "wanted for domestic aggravated battery" and the "[w]eapon used was a baseball bat;" and that three children between 3 and 7 should be in the vehicle. Defendant heard the bulletin on his radio. He heard that the suspect was wanted for aggravated domestic battery, the car description, that he might be heading to his residence in Antioch, and that children were in the vehicle. Defendant did not testify, he heard that the weapon used was a baseball bat. Defendant testified that, prior to the arrest he was also

aware that the victim had suffered sufficiently serious injuries that she had been hospitalized.

It was soon reported over the police radio that the car had been spotted with the children inside and the suspect had fled instead of stopping. Shortly thereafter defendant spotted the car. Defendant pursued the car and found it parked at a house in Antioch, which turned out be the home of plaintiff's brother. Defendant and another officer were the first two to arrive at the brother's house. Defendant talked to plaintiff through a door and requested that he come out. Plaintiff declined, saying he would not come out until his family members were there. Defendant believed he heard plaintiff say to someone inside, "go get a gun," and reported this to other officers at the scene.

The Lake County Sheriff's Tactical Response (SWAT) team soon arrived and surrounded the house. It was approximately 10:00 a.m. Negotiations with plaintiff then ensued for approximately two hours. At the time, Richard Eckenstahler was the Chief of Operations for the Lake County Sheriff. Once he arrived at the brother's house, Eckenstahler was in command. Eckenstahler was informed there was a loaded gun in the house, but defendant did not learn of this information prior to effecting the arrest. Eckenstahler was eventually informed

that plaintiff was threatening to drown his children.[6] Eckenstahler then made the decision to breach the house. Defendant kicked in the door of the house. Prior to the breach, defendant was informed it was being done due to threats to the children.[7]

Upon entering the house, defendant saw children and he saw plaintiff grab the youngest child (a three-year-old girl) and head to the back of the house. Defendant took out a taser. Defendant and other officers followed plaintiff, who went into a bathroom with the child. Defendant was just behind plaintiff and kicked open the bathroom door. Deputies John Willer and Leroy Pegusek were immediately behind defendant. Defendant ordered plaintiff to "Get Down." Plaintiff kneeled down and was hit with defendant's taser as he "was proceeding to

---

[6]Whether or not this information turned out to be accurate is not relevant. It is relevant that Eckenstahler passed information on to defendant prior to the arrest. The information was reported by N.M.'s sister based on her husband (plaintiff's close friend) talking to plaintiff during the standoff and then telling his wife that plaintiff said he was giving the children a bath and the husband expressing worry that the children would be harmed. After plaintiff's arrest, the husband denied making these statements to his wife. There is no evidence that the sister/wife denies providing this information to the Sheriff's Department. The husband's statements do not create a genuine factual dispute as to what defendant was told. It is taken as true that defendant was told the house was being breached because of threats to the children's lives.

[7]Defendant does not point to any evidence that he knew the reported threat was to kill them by drowning.

put [one] hand over [his] head." Pl. Dep. 84. With the other hand, plaintiff was holding his daughter who was straddled on his right hip. The taser hit plaintiff in the left abdomen.[8] Electricity was applied for five seconds.[9] Four more seconds passed and then plaintiff was tased a second time for five seconds. Three more seconds passed and then plaintiff was tased a third time for five seconds. From the first firing of the taser until the finish of the third taser burst, a total of 22 seconds passed.

Upon first being tased, plaintiff released his daughter and Pegusek took her away.[10] Upon tasing plaintiff, defendant immediately pushed plaintiff over. Between the tasing and defendant's physical force, plaintiff fell to the ground with

---

[8]Defendant contends this shot was not incapacitating because the two taser probes were only two inches apart. Defendant submits the affidavit of a purported taser expert stating a taser is not disabling when the probes are only two inches apart. Even assuming sufficient support that the affiant is a taser expert, he was not present when plaintiff was tased. Defendant does not point to evidence that the probes were only two inches apart.

[9]Evidence supports that the time of day in the taser's clock was inconsistent with when plaintiff was actually tased. There is no evidence that the taser was inaccurate as to the amount of time that passed during and between tasings.

[10]Defendant testified he hit plaintiff on the side of the neck to get him to release his daughter and then tased him after the daughter was released. On defendant's summary judgment motion, plaintiff's version of the event, as stated in his deposition, is generally being accepted as true.

defendant partially on top of plaintiff. According to plaintiff's deposition testimony, he was handcuffed behind his back (by an officer other than defendant) during the first five-second taser burst.[11] According to plaintiff's testimony, during the time between the first and second taser bursts, which was four seconds, defendant punched plaintiff in the head three times, while, at the same time, another officer was kicking or stomping on his hands. Plaintiff testified that the kicking/stomping stopped at that point, but that defendant continued to punch him until the third tasing was completed. During the third tasing, plaintiff briefly blacked out and lost control of his bodily functions, urinating and defecating in his pants. Both sides agree that, following the third tasing, plaintiff said "No more, no more," with both agreeing that he offered no resistance at this point. While the two sides disagree as to when plaintiff was first handcuffed, they do agree that he was handcuffed no later than immediately following the third tasing. At that point, defendant and Willer then taunted plaintiff regarding soiling himself and teaching him "not to hit a girl." However, no further force was used. Plaintiff had

---

[11]Defendant and Willer testified that they did not try to grab plaintiff's hands until after the first tasing and did not successfully handcuff plaintiff until after the third tasing, when plaintiff stopped offering resistance.

a fractured finger and facial bruises and was later treated at a hospital.[12]  Based on

plaintiff's statement that he had briefly blacked out, it was also determined that

plaintiff suffered a concussion.

Defendant contends plaintiff's version of being subdued should not be

accepted on summary judgment because it is not credible that plaintiff could be

tackled and handcuffed during the five seconds of the first taser burst nor punched

three times and kicked during the four-second interval between taser bursts.

Defendant also contends that plaintiff lacks credibility, claiming that plaintiff's

deposition testimony is inconsistent with the description of the encounter

contained in plaintiff's *pro se* complaint.  In the complaint, plaintiff states:[13]  "I

was tasered and beaten throughout my body, head and face while in handcuffs.  I

was lying face down on my stomach, handcuffed, tasered and being beaten by

---

[12]Defendant contends these injuries were caused by N.M.'s resistance earlier in the day.  Defendant points to statements to that effect made by plaintiff after his arrest and the adverse inference to be drawn from plaintiff's refusal to presently answer questions regarding whether N.M. caused any of the injuries. Plaintiff, however, points to evidence that a person at his brother's house did not see any such injuries on plaintiff prior to the police arriving.  There is a genuine factual dispute that, on defendant's summary judgment motion, must be resolved in plaintiff's favor even in light of plaintiff's invocation of the Fifth Amendment and the adverse inference drawn therefrom.

[13]Apparent typographical, grammar, and/or spelling errors have been corrected.

Deputy George Love and other deputies . . . . I began to get dizzy from numerous blows to the head, face and body. I was losing consciousness and defecated on myself. The beating finally stopped after I went limp. . . . Deputy George Love jumped on my back after I was handcuffed and repeatedly struck my face and head." Defendant contends that, at the deposition, plaintiff downplayed the original allegations of being repeatedly struck because, by then, plaintiff learned there were objective taser records establishing the short length of the confrontation.

Plaintiff's testimony is not so incredible or inconsistent that it cannot be believed. Alleging he was "repeatedly struck" is not inconsistent with plaintiff's deposition testimony. Also, 22 seconds of being tased and allegedly hit may seem much longer to the person suffering those inflictions. It would not have been impossible to land three punches in four seconds, even if a taser gun was being held with the other hand. Also, a jury could find that, in light of being chased and tased, plaintiff's testimony was generally true, but not absolutely accurate. It could be found, in light of plaintiff's and the officers' testimony, that the punching and kicking occurred, but carried over into the second tasing. A jury may choose to believe the officers' testimony over plaintiff's, particularly in light of possible

impeachment of plaintiff. Even if it is more likely than not that a jury would believe the officers' testimony, it would not be unreasonable for a jury to believe plaintiff. On summary judgment, the court may not make credibility determinations. *See Lawson v. Veruchi*, ___ F.3d ___, 2011 WL 256980 *5-6 (7th Cir. Jan. 28, 2011). On defendant's summary judgment motion, plaintiff's version of the confrontation in the bathroom creates a conflict in the evidence.

Defendant contends the force used to subdue plaintiff was reasonable because defendant knew plaintiff was suspected of aggravated battery, defendant believed there was a threat to the children, there was information indicating plaintiff had a gun, plaintiff had been involved in a car chase, and plaintiff had just run into the bathroom with his daughter upon defendant and other officers entering the home. In those circumstances, defendant contends it was reasonable to make sure plaintiff was completely subdued and not able to use a weapon or cause other harm before refraining from using force. Defendant relies on *Johnson v. Scott*, 576 F.3d 658 (7th Cir. 2009), and *Bell v. Irwin*, 321 F.3d 637 (7th Cir. 2003).

> The question whether the use of force during an arrest is proper under the Fourth Amendment depends on the objective reasonableness of the officer's actions, judged on the basis of the conditions the officer faced. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In order to assess objective reasonableness, the court must consider all the circumstances,

including notably "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

*Johnson*, 576 F.3d at 660.

In *Johnson*, a shooting was reported to have occurred at a lounge and it was also reported that a white Caprice had left the parking lot. When defendant Scott came upon the Caprice being driven by plaintiff Johnson, Scott began a pursuit. Johnson ran a stop sign and sped on icy roads until he came upon a police roadblock. Johnson then fled on foot. Scott pursued Johnson on foot along with Scott's police dog, Archer. Johnson continued running through a residential neighborhood. He hurtled a waist-high fence, but had to stop when he came upon a five-foot wood fence. He then turned, put his arms up in the air, and said, "I give up." *Id.* at 659.

Scott and Archer were only six to eight feet behind Johnson when he uttered those words. Archer grabbed Johnson's left arm, and Scott knocked Johnson to the ground with his forearm. Johnson was struggling to get away from Archer's biting, but Scott interpreted this as resistance, and so he struck Johnson several times to subdue him. When Archer moved to bite Johnson's upper left leg, Scott was able to get a grip on Johnson's left arm and successfully handcuff him. No

more than five or ten seconds later, Scott ordered Archer off Johnson, and the dog complied. There is no evidence that Scott used any further force after that point.

*Id.* at 659-60.

The Seventh Circuit held that these facts constituted the reasonable exercise of force even in light of Johnson's indication that he was giving up.

Johnson insists on appeal that it was unreasonable for Scott to use Archer or strike Johnson after he had put his hands in the air and said "I give up." It is well established that a police officer may not continue to use force against a suspect who is subdued and complying with the officer's orders. [Citations omitted.] But that principle depends critically on the fact that the suspect is indeed subdued. Here, Scott had no idea how Johnson was going to behave once he was cornered. No law that we know of required Scott to take Johnson's apparent surrender at face value, a split second after Johnson stopped running. Until he encountered a fence that was too high for him to jump over, Johnson had used every method at his disposal to flee from the police. The surrender also did not establish that Johnson was unarmed. A reasonable officer could think that the use of the dog was necessary to help control Johnson; otherwise, Johnson might have had the time he needed to retrieve and use a weapon. Finally, it is worth noting that it could not have been more than one second between Johnson's surrender and the use of force by Scott, given the distance between Archer and Johnson at the time of surrender. In short, Scott's use of force--in the form of Archer--to subdue Johnson was objectively reasonable, given the uncertainties in the situation that faced him.

> . . . We acknowledge that there was no verbal warning
> in this case. Johnson did not argue, however, that such a
> warning would have made a difference, and on these facts, it
> is easy to imagine why. As the district court pointed out,
> "Scott had no real opportunity to [warn] given Johnson's
> head-long flight and surprising, last-second surrender."

*Id.* at 660-61. *See also **Brady v. Scott**,* 2010 WL 3946527 (N.D. Ind. Oct. 5, 2010) (another case involving Scott and Archer chasing a fleeing suspect who then made an attempt to surrender).

*Bell* also involved a fleeing suspect and domestic violence. Plaintiff Bell locked himself in a home, threatened officers who surrounded it, threatened to kill himself, and threatened to blow up the house. The police first attempted negotiations. 321 F.3d at 638-39. When Bell opened the door, threatened to blow up the home, and defendant Irwin saw him "lean toward a [fuel] tank with what appeared to be a cigarette lighter," Irwin shot him with bean-bag rounds. Four rounds of bean bags knocked Bell unconscious. *Id.* at 639.

The Seventh Circuit commented that Bell "should have thanked rather than sued the officers." *Id.* at 640. Defendant cites *Bell* for its discussion regarding officers having to make quick decisions. As the Seventh Circuit noted "the fourth amendment does not require second-guessing if a reasonable officer

making decisions under uncertainty and the press of time would have perceived a need to act." *Id.* Also, the Seventh Circuit noted that the reasonableness of the force used is a legal question, not a fact question. On facts regarding a confrontation that are taken for true on summary judgment, it is a question for the court whether the use of force was reasonable. *Id.*

Here, defendant was aware plaintiff had been pursued in his car and then holed up in a home for a couple hours. Defendant had information that plaintiff had engaged in significant violence the night before and also had reason to believe plaintiff might be armed. Defendant had also been informed that there was a threat to the children being held in the house. Upon coming into the house, defendant saw plaintiff grab his daughter and take her into the bathroom. Defendant had reason to act quickly, in an attempt to avoid any harm to the daughter or anyone else in the house. In this circumstance, it was reasonable for defendant to kick in the bathroom door and tase plaintiff before he could possibly harm his daughter or the officers, even with plaintiff kneeling down.

The officers testified that plaintiff continued to struggle until the third tasing. If that is true, there is no basis for an excessive force claim since defendant could continue to use reasonable force until it was sufficiently clear plaintiff was

subdued. On summary judgment, however, plaintiff's testimony must be credited. On summary judgment, it must be assumed that plaintiff offered no resistance following the initial tasing and his arms were handcuffed or otherwise immobilized as soon as or seconds after the first tasing ended. Although this is a close case, on the facts assumed to be true, it was unreasonable to continue to hit, kick, and tase plaintiff after the first tasing. It should have taken only seconds to realize plaintiff was subdued. It will be a fact question for the jury as to when defendant should have recognized plaintiff was subdued. Further tasing or punching after that point would not be reasonable.

Plaintiff also complains that defendant allowed Willer to kick plaintiff. Any kicking, however, only lasted for seconds after the first tasing. There is no evidence supporting that defendant had a realistic opportunity to stop any kicking that occurred. Defendant cannot be held responsible for any kicking by Willer. *See Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000); *Muzquiz v. Beaton*, 2010 WL 883651 *4 (S.D. Ind. March 5, 2010); *Birdo v. Centralia Police Dep't*, 2010 WL 725243 *2 (S.D. Ill. Feb. 25, 2010).

Even if the excessive force claim is not otherwise subject to dismissal in its entirety, defendant contends he is entitled to qualified immunity. Prior to

July 1, 2007, it was well established that an officer cannot continue to use force against a suspect who is subdued. *See Johnson*, 576 F.3d at 660 (collecting cases). On the facts assumed to be true for purposes of summary judgment, defendant continued to use force after it was clear plaintiff was subdued. Defendant is not entitled to qualified immunity. *See Payton v. Fike*, 2010 WL 3326130 *6 (N.D. Ind. Aug. 24, 2010).

Plaintiff's excessive force claim will not be dismissed. However, his claim is limited to attempting to prove that defendant himself administered excessive force after the first taser burst.

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [35] is granted in part and denied in part. Plaintiff's claim for excessive force is limited to the contention that defendant himself applied excessive force after the first taser burst was applied to plaintiff. This case will be referred to the assigned magistrate judge for a pretrial conference and set for status before Judge Hart on April 21, 2011 at 11:00 a.m.

ENTER:

William T. Hart

UNITED STATES DISTRICT JUDGE

DATED: FEBRUARY 10, 2011